Chester agt. Dickinson.

# COURT OF COMMISSION OF APPEALS.

GEORGE N. CHESTER *et al.*, plaintiffs and respondents, agt. JOHN S. DICKINSON, EDGAR REED *et al.*, defendants and appellants.

1. Two or more persons may become partners in buying or selling land.
2. There is nothing in the nature or essence of a partnership which requires that it should be confined to ordinary trade and commerce or to dealings in personal property. It may exist between attorneys, conveyancers, mechanics, owners of a line of stage coaches, artisans or farmers, as well as between merchants and bankers, and it may exist between dealers and speculators in real estate.
3. The objection to the validity of a partnership entered into for speculating in real estate by parol is that it is an agreement affecting lands, and therefore void by the statute of frauds; but this court decides that where two persons enter into a parol copartnership to speculate in lands they do not come in conflict with the statute of frauds. When the agreement is made no lands are owned by the firm, and neither party attempts to convey or assign any to the other. The contract is a valid one, and in pursuance of this agreement they go on and buy, improve and sell lands. While they are doing this, they act as partners, and bear that relation to each other. Within the meaning of the statute in such case neither conveys nor assigns any land to the other, and hence there is no conflict with the statute.
4. The statute of frauds is not so broad as to prevent proof by parol of an interest in lands. It is simply aimed at the creation or conveyance of an estate in lands without a writing.
5. In all partnerships one partner is the general agent of all the parties for the transaction of all the partnership business. This rule of agency applies to partnerships in real estate, except so far as it is modified by the character of the property, and the only difference grows out of the rules of law in reference to the conveyance and transmission of real estate· One partner cannot convey the whole title to real estate unless the whole title is vested in him. But he can enter into an executory contract to convey, which a court of equity will enforce. While a contract for the

Chester agt. Dickinson.

conveyance of land must be in writing, yet an agent to execute the contract may be appointed by parol. Hence, when the partnership business is to deal in real estate, one partner has ample power as general agent of the firm to enter into an executory contract for the sale of real estate.

6. Dormant partners in a real estate partnership are liable to all persons dealing with the firm, in the same manner and to the same extent that dormant partners in commercial partnerships are held liable.

7. The cases of *Pitts* agt. *Waugh* (4 Mass. R., 424) and of *Patterson* agt. *Brewster* (4th Ed. Chy. R., 322) overruled, and the case of *Bemis* agt. *Harrison* (19 Barb., 53) approved.

8. This court held a partner in a real estate partnership subject to the same liability for the frauds of his copartner as a copartner is liable in an ordinary commercial copartnership for the frauds committed by his copartner in the course of the transactions and business of the partnership, even when the other partners have not the slightest connection or knowledge or participation in the fraud.

9. It was proper for the plaintiff, in an action brought to recover damages sustained by him by reason that certain lands were falsely stated to be oil-producing lands when they were not, to prove that petroleum oil was poured on the land by one of the partners, aided by an agent in the fraud, both before the partnership was formed and after the lands were transferred to the plaintiff. This evidence tended to reflect light upon the fraud complained of, and was competent for that purpose. It was also competent upon the question as to whether they were oil-producing lands, as represented.

10. Where a witness, on cross-examination, was asked by the plaintiff's counsel whether he did not on a certain day before Squire P. testify that there was stolen from the barn of one of the defendants certain oil cans, to which he answered he did. He was then asked, did you testify or swear to these facts in an affidavit, to which objection was made that the affidavit should be produced and shown to the witness. The cross-examining counsel thereupon produced the affidavit and showed it to the witness, who stated, this is the affidavit I made, and thereupon the counsel offered and was about to read the same in evidence. The defendants' counsel then objected to the affidavit as irrelevant and immaterial, to which the court said, put your question. Defendants' counsel said, "we except." The question was then put, and the witness answered, "I did." This court held there was no error in this, the defendants' counsel having originally objected to the inquiry because the affidavit was not produced. When it was produced, he was estopped from afterwards objecting to the inquiries on another and different ground.

Chester agt. Dickinson.

*Before* LOTT, *Ch. C.*, EARL, GRAY, JOHNSON *and* REY-
NOLDS, *CC.*

*Argued at the January Term*, 1873; *decided at the March
Term*, 1873.

APPEAL by the defendants, Dickinson and Reed, from a judg-
ment of the general term of the second judicial district,
affirming a judgment in favor of the plaintiffs, entered upon
a verdict, and affirming an order denying a motion for a new trial.

The action was brought for fraud and deceit in an alleged
sale of land. The complaint alleges that the defendants, Dick-
inson, Reed, Jones, and a fourth defendant named De Wint,
who died during the pendency of the action, conspired to
induce the plaintiffs to purchase, as oil-producing lands, cer-
tain lands in the county of Dutchess in the State of New York,
being three farms in the town of Fishkill, known as the Bogar-
dus, the Scofield and the Jones farm. That the defendants
secretly poured petroleum upon said lands for the purpose of
inducing the plaintiffs to believe that such oil was the sponta-
neous production of said lands, and falsely represented to the
plaintiffs that the oil which they had so put on said lands was
the natural product of the same. That the plaintiffs were
thus induced to believe that such lands were oil-producing
lands, and on the 24th of December, 1864, paid the defend-
ants the sum of $39,000 for certain contracts for the purchase
of said lands, which had been previously entered into by said
defendants with the owners thereof.

The complaint further alleges that, after the payment of
the $39,000 and the assignment to the plaintiffs of the con-
tracts for the purchase of said lands, the defendants continued
to pour petroleum upon said lands, and the plaintiffs, being
deceived by such acts, were induced, after the assignment to
them of such contracts and before the commencenent of the
action, to expend upon and on account of the purchase of the
said lands of the owners thereof, and in operations and mining
thereon, the further sum of about $40,000.

Chester agt. Dickinson.

The answers deny all these allegations of the complaint, and all fraud and complicity with any fraud or deceit. The cause was tried at the Dutchess circuit on the 5th of December, 1866, and the jury found a verdict against all the defendants for $51,873. A motion was made for a new trial on the minutes of the judge, which was denied, and judgment entered. The defendants, Dickinson and Reed, each appealed separately from the order denying a new trial, and from the judgment; the judgment and order were affirmed at the general term.

The defendants, Reed and Dickinson, appealed separately to this court. The evidence of fraud, upon which the plaintiffs relied and upon which the verdict mainly was found, consisted of the testimony to his own acts by a person named Benjamin Higgs, who testified that he was employed by the defendants, Jones and Reed, to put petroleum upon the lands, from time to time, frequently, in the fall of 1864 and the winter following, for the purpose of giving them the appearance of oil-producing lands.

On the 28th day of November, 1864, the defendants entered into a written agreement, signed by all of them, in which they agreed to purchase, lease and take refusals of land on their joint account, in the town of Fishkill, situate and lying along the Fishkill creek, specifying particularly the Bogardus farm, the Scofield farm and the Jones farm, and also "such other parcels or farms along said creek as they may consider to be to their mutual advantage, and that they should sell, lease or work the lands thus taken; and they further agreed that all moneys expended and all loss sustained by reason of such purchases, leases or refusals and the working thereof, should be borne equally amongst them, share and share alike, and that all the gains and profits thereof should be shared in the same way, and that all the leases and refusals then made and thereafter to be made should be taken in the name of defendant, Reed, for the equal benefit of all the parties.

There was some evidence tending to show that this associa-

tion or partnership was actually formed by parol as early as September, 1864.

On the 29th day of October, 1864, Bogardus executed a contract with Reed, giving him the refusal of his farm of forty-seven and a half acres of land, at $100 per acre, until the first day of January then next. On the 20th day of October, Scofield executed a contract with Reed, giving him the refusal of his farm of sixty acres, at $100 per acre, until the 15th day of March then next, and on 15th day of December, 1864, Reed obtained an assignment of a contract for the Jones farm of 143 acres, at $150 per acre. About the 1st day of December, 1864, the defendant, Reed, opened negotiations with the plaintiffs to sell these lands to them, and represented to them that they were oil-producing lands, and took one of the plaintiffs upon the lands and showed him the indications of oil thereon, which had been produced by pouring petroleum thereon, representing and holding out to the plaintiff that the oil found there was the natural product of the land. On the 10th day of December, Reed proposed to plaintiffs to sell them these three farms, and on the 12th of December the plaintiffs accepted the proposition, and subsequently paid to the defendants, which was divided equally between them, $39,000 for the refusal of the Bogardus and Scofield farms, and the contract for the Jones farm. On the 20th of December Reed assigned to the plaintiffs the refusals and contract by a formal written assignment, and the plaintiffs thereafter paid for and took conveyances of the farms from the owners thereof.

It appeared upon the trial that Jones was the defendant principally engaged in perpetrating the fraud by causing the deceptive appearance of oil upon the land. There was some evidence also tending to show that Reed participated, to some extent, in this fraud. But there was no evidence whatever that Dickinson had anything whatever personally to do with the fraud, or that he knew that any fraud was practiced.

At the close of plaintiffs' evidence, and again at the close of all the evidence, a motion was made, on behalf of defend-

ant, Dickinson, to dismiss the complaint as to him, on the ground that there was no evidence to connect him with the alleged fraud, and the motion was denied and Dickinson excepted.

The court charged the jury that the defendants were partners under their written agreement, dated November 28, 1864, and submitted to them to find whether they did not become such prior to that date by oral agreement; and he charged that each defendant was liable for the fraud personally committed by him, and that from the time they became partners all were liable for the fraud committed by either in and about the partnership business; exceptions were taken by the defendants to the charge.

The defendants requested the court to charge that every one of the defendants must be acquitted by the jury and have a verdict in his favor, unless the jury believe that he personally made, or procured to be made, the false representations charged in the complaint, and thereby induced the plaintiffs to make the contract with the defendants. The court refused so to charge and the defendants excepted.

The defendant, Dickinson, requested the court to charge: 1. That the jury must find a verdict in his favor, there being no evidence whatever that he had any concern in or knowledge of any fraudulent acts or representations whatever; 2. That he is not responsible, and cannot be made liable to the plaintiffs for any fraudulent acts or representations made or procured by the defendant, Jones, or any other person, unless with the knowledge or procurement either of Reed or himself, even if the jury should believe that such acts or representations were made; 3. That the jury must find a verdict in favor of the defendant, Dickinson, unless they believe that he personally knew or consented to some fraudulent act or representation to the plaintiffs, which procured the sale. The court refused so to charge, as to each request, and there was no exception.

There are other exceptions to the rulings of the judge

during the progress of the trial, which, so far as important, are noticed in the following opinion. The case in the supreme court is reported in 52 Barb., 349.

JAMES EMOTT & ABRAM WAKEMAN, *for appellants.*
A. ANTHONY & DENNIS McMAHON, *for respondents.*

EARL, C.—It cannot be questioned that two or more persons may become partners in buying and selling land.   There is nothing in the nature or essence of a partnership which requires that it should be confined to ordinary trade and commerce, or to dealings in personal property (*Story on Part.*, secs. 82, 83; *Collyer on Part.*, secs. 3, 51, *and note; Dudley* agt. *Littlefield*, 21 *Maine*, 418; *Sage* agt. *Sherman*, 2 *N. Y.*, 417; *Mead* agt. *Shepard*, 54 *Barb.*, 474; *Pendleton* agt. *Wambersive*, 4 *Cranch*, 73; *Thompson* agt. *Bronnson*, 6 *Wallace*, 316; *Hoxie* agt. *Carr*, 1 *Sumner*, 173). Kent says a partnership is a contract of two or more persons to place their money, effects, labor and skill, or some one or all of them, in lawful commerce or business, and to divide the profits and share the loss in certain proportions; and that it is not essential to a legal partnership that it be confined to commercial business.   It may exist between attorneys, conveyancers, mechanics, owners of a line of stage coaches, artisans or farmers, as well as between merchants and bankers (3 *Kent Com.*, 24, 28); and why may it not exist between dealers and speculators in real estate?   But as it is claimed that the partnership in this case existed by parol before the execution of the written agreement, dated November 28, 1864, it is necessary to inquire whether a partnership in reference to lands can be formed and proved by parol.   Upon this question there is considerable conflict in the authorities. On the one hand, it is claimed that a parol agreement for such a partnership would be within the statute of frauds, which provides that no estate or interest in lands shall be created, assigned or declared, unless by act or operation of

law, or by a deed or conveyance in writing, subscribed by the party creating, granting, assigning or declaring the same; and to this effect is the case of *Smith* agt. *Burnham* (3 *Sumner*, 345). On the other hand, it is claimed that such an agreement is not affected by the statute of frauds, for the reason that the real estate is treated and administered in equity as personal property for all the purposes of the partnership. A court of equity, having full jurisdiction of all cases between partners touching the partnership property, it is claimed that it will inquire in, take an account of, and administer upon all the partnership property, whether it be real and personal, and, in such cases, will not allow one partner to commit a fraud as a breach of trust upon his copartner by taking advantage of the statute of frauds; and to this effect are the following authorities; *Dale* agt. *Hamilton* (5 *Hare*, 369); *Essex* agt. *Essex* (20 *Beavan*, 449); *Bemnel* agt. *Taintor* (4 Com., 568). The full discussion of the question is found in *Dale* agt. *Hamilton;* and the reasoning and review of the cases there by vice-chancellor WAGRAM are quite satisfactory.

The general doctrine is there laid down that a partnership agreement between A. and B. that they shall be jointly interested in a speculation for buying, improving for sale, and selling lands, may be proved without being evidenced by any writing signed by, or by the authority of, the party to be charged therewith within the statute of frauds, and such an agreement being proved, A. or B. may establish his interest in land, the subject of the partnership, without such interest being evidenced by any such writing. "I am inclined to think this doctrine to be founded upon the best reason and the most authority; but whether it is or not, it is not very important to decide in this case." Most of the conflict in the authorities has arisen in controversies about the title to the real estate after the dissolution of the partnership or the death of one of the partners. But suppose two persons by parol agreement enter into a partnership to speculate in lands, how do

they come in conflict with the statute of frauds? No estate or interest in land has been granted, assigned or declared. When the agreement is made no lands are owned by the firm, and neither party attempts to convey or assign any to the other. The contract is a valid one, and in pursuance of this agreement they go on and buy, improve and sell lands. While they are doing this do they not act as partners and bear a partnership relation to each other? Within the meaning of the statute, in such case neither conveys or assigns any land to the other, and hence there is no conflict with the statute. The statute is not so broad as to prevent proof by parol of an interest in lands. It is simply aimed at the creation or conveyance of an estate in lands without a writing.

If there was a parol agreement in this case before the written one, it was just like the one embodied in the writing, to wit, a partnership to purchase, lease and take refusals of land, and then sell, lease or work them for the joint benefit of the parties. This is not a controversy about the title to any of the lands taken or owned by the partners, but it simply relates to the conduct of the defendants while they were acting as partners, and in such a case the statute of frauds certainly can present no obstacle to relief.

We then come to the question whether there was sufficient proof of the existence of this partnership by parol before the 28th of November, 1864, and I cannot doubt that there was. Jones distinctly testified that the partnership between all the defendants did exist as early as September; and that it was afterwards put into writing. Neither Reed nor Dickinson, in their testimony, denied this; and neither of them claimed that they did not become partners until the writing was executed. There is abundant evidence that Reed was associated with Jones as early as the latter part of September or the fore part of October. It does not appear how or by what negotiation the members of the firm were brought together in partnership; and it does not appear through what agency Dickinson was induced to join with the others.

As to him, all we have is the evidence of Jones, above refer-
red to, and the writing, and the fact that he subsequently,
without objection, in the division of the money received from
the plaintiffs, allowed his share of the sums paid for the ser-
vices of Higgs, who was employed to pour oil upon the lands
from some time about the first of September.

Hence, we must take it as proved in this case that this part-
nership existed as early as September, 1864. But it is
claimed, on the part of the appellants, that all the rules of
commercial partnerships do not apply to a partnership in real
estate; they apply to every other kind of partnership, and
why not to this? This kind of partnership is formed, like
every other, for the mutual profit and advantage of the par-
ties; and there is no reason why it should not be governed
by the same rules. In all partnerships one partner is the
general agent of all the parties for the transaction of all the
partnership business; and I can perceive no reason for not
applying the same rule of agency to partnerships in real
estate. In fact, all the powers, duties and rights which
usually appertain to partnerships must appertain to partner-
ships in real estate, except as they are modified by the charac-
ter of the property; and the only difference grows out of the
rules of law in reference to the conveyance and transmission
of real estate. One partner cannot convey the whole title to
real estate, unless the whole title is vested in him ( *Van Brunt*
agt. *Applegate*, 44 *N. Y.*, 544); but he can enter into an
executory contract to convey, which a court of equity will
enforce; while a contract for the conveyance of land must
be in writing, yet an agent to execute the contract may
be appointed by parol ( *Willard on Real Estate*, 376);
and, hence, when the partnership business is to deal in
real estate one partner has ample power, as general agent
of the firm, to enter into an executory contract for the
sale of real estate. I find no authority holding that the rules
of ordinary commercial partnership do not apply to partner-
ships in real estate, except the case of *Pitts* agt. *Waugh* (4

*Mass.*, 424). · It was there held that the law merchant repecting dormant partners did not extend to speculators in land. The learned judge writing the opinion did not cite any authority for the decisions he made, and his reasons for the conclusions which he reached are not satisfactory.

Dormant partners are held liable for the debts and contracts of the firm, because they are, in fact, members of the firm and share in its profits, and the law will not allow them secretly to share in the profits of the firm, without taking their share of the risks and bearing their share of the loss as to third persons.   And there is precisely the same reasons for holding a dormant partner, in a real estate partnership, liable to all persons dealing with the firm. In *Patterson* agt. *Brewster* (4 *Ed. Ch. R.*, 322), the vice-chancellor expressed the opinion that the law merchant does not apply to partners in buying and selling land.   This case and *Pitts* agt. *Waugh* are commented on by judge MITCHELL in *Bennis* agt. *Harrison* (19 *Barb.*, 53), and are there shown not to be precise authority for the doctrines announced.

It follows, therefore, that the court committed no error in holding that all the partners were liable for the frauds committed by either in the transaction and prosecution of the partnership enterprise, for it is well settled that the firm is bound for the fraud committed by one partner in the course of the transactions and business of the partnership, even when the other partners have not the slightest connection with or knowledge or participation in the fraud (*Story on Part.*, sec. 108 ; *Collyer on Part.*, sec. 445 ; *Griswold* agt. *Hobber*, 25, *N. Y.*, 595).

The conclusion I have thus far reached disposes of most of the important exceptions discussed upon the argument before us.   It remains only to examine a few exceptions taken to the rulings of the judge at the trial as to evidence.   The plaintiffs, against the objection of the defendants, were permitted to prove that Jones and Higgs put oil upon the land, both before the partnership was formed and after the lands

Chester agt. Dickinson.

were transferred to the plaintiffs. In this there was no error. The evidence all tended to reflect light upon the fraud complained of, and was competent for that purpose.

The evidence of what Jones and Reed did before the partnership was formed and after the transfer, was at least competent against them. It was also competent to show that oil was placed upon the land at any time, upon the question whether these were oil-producing lands, as represented. The court instructed the jury that the plaintiff could not recover for any representations made or acts of fraud committed before the partnership was formed or after the sale was made. The evidence, as limited by this instruction, was properly left for the consideration of the jury. Higgs testified that in January, 1865, Jones met him at the house of a Mr. Thorn, and arranged with him that he should say no to everything he should ask him in the presence of Thorn, and that Jones, on that occasion, put two ten dollar bills into his pocket, which he afterward showed to Thorn. Thorn was afterward called and testified that Jones and Higgs met at his house on the occasion spoken of, and that after an interview between them, Jones first calling the attention of Thorn to what he was about to say, asked Higgs if he had been making known to the public that he had been throwing oil upon the lands, and that Higgs denied that he had; that Jones and Higgs then went out of the house, and in two or three minutes Higgs returned and took out of his pocket two ten dollar bills and showed them to him. This last evidence, the showing of the bills, was objected to by the defendants. I can see no objection to the evidence. It was competent against Jones. It showed that he was trying to make evidence to cover up his frauds, and it was also competent as going to show payment by Jones for the services of Higgs in and about the fraud complained of or for his lying about it.

It was not a declaration of Higgs, but right after the interview he showed the money which he testified was given to him by Jones.

It thus had a tendency to confirm his evidence, which was competent against Jones, and it was so near the time of the payment of the money to him by Jones, and the interview between him and Jones, that it may fairly be treated as a circumstance connected with and part of the transaction. On the trial Higgs testified that some of the oil which was placed upon the lands was brought to his house in tin cans, and Jones in his evidence denied all knowledge of and connection with these cans.

On his cross-examination Jones was asked the following question : "Didn't you on the nineteenth day of November, 1866, before 'Squire Phillips, of the town of Fishkill, testify that there was stolen from the barn of John W. Jones, at Fishkill Landing, in said town, one five-gallon tin can and one one-gallon tin can?" He answered, he did. He was then asked, "Did you testify or swear to these facts in an affidavit?" Defendants' counsel then objected to the inquiry as to what the witness swore to in an affidavit, and insisted that plaintiffs' counsel should produce the affidavit itself and show it to the witness. Plaintiffs' counsel thereupon produced the affidavit and showed it to the witness, who stated, "this is the affidavit I made," and offered and was about to read the same in evidence. Defendants' counsel then objected to the affidavit as irrelevant and immaterial, and the court said, "put your question." Defendant's counsel said, "we except." The question was then put and the witness answered, "I did." The exception thus taken is not relied on. It is not well founded. The ground of the defendants' objection was that the affidavit should be produced and shown to the witness before he should answer the question. This was done, and after defendants' counsel objected to the reading of the affidavit, the court allowed the witness to answer that he did state the facts in the affidavit. All seems to have been done that was required by defendants' counsel, and they should not now be permitted to claim that the affidavit should have been put in evidence. When he objected to the evi-

dence the counsel did not claim that the affidavit should be put in evidence to show the facts contained in it, but his claim was that it should be produced and shown to the witness, and then he objected to the reading of the affidavit.

The court had no reason to suppose that the exception finally taken was upon the ground that the witness was permitted to state what the affidavit contained, and that the affidavit itself was not read. This exception should not, therefore, be permitted to prevail.

I have thus examined all the allegations of error which I deem of sufficient importance to require consideration, and I reach the conclusion that the judgment should be affirmed, with costs.

EARL, C., reads for affirmance.

All concur, except GRAY, C., for reversal; LOTT, Ch. C., not sitting.

Judgment affirmed, with costs.